UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DANA WILBUR,                          No. 2:06-cv-02181-MCE-EFB

      Plaintiff,

   v.                                 <u>MEMORANDUM AND ORDER</u>

SILGAN CONTAINERS
CORPORATION,

      Defendant.

----oo0oo----

Silgan Containers Corporation ("Defendant" or "Silgan") manufactures and supplies cans for Campbell's Soup and other customers.  Dana Wilber ("Plaintiff") worked as a production supervisor at Defendant's Sacramento plant from August 2001 through May 2006.  In 2003, with financial support from Defendant, Plaintiff returned to school and obtained an MBA.  In 2005, Plaintiff's immediate superior was promoted to plant manager.  Shortly thereafter, Plaintiff realized he would not be selected to fill the position his former superior had vacated.
///

1

Plaintiff resigned from Silgan, and began working as a production supervisor for another can manufacturing company.  On July 12, 2006, Plaintiff filed a Complaint against Defendant, alleging failure to pay overtime compensation, failure to provide adequate meal and rest periods, and failure to itemize wage statements. Defendant countered that Plaintiff was a salaried executive and therefore exempt from overtime compensation under state and federal law.  Defendant counterclaimed, alleging Plaintiff must repay Defendant $10,300.00 in educational loans because Plaintiff severed his employment before the minimum two-year service requirement.  For the following reasons, Defendant's Motion for Summary Judgment is GRANTED as to all of Plaintiff's claims and as to Defendant's counterclaim.[1]

**BACKGROUND**

Silgan's Sacramento plant manufactures cans for Campbell's Soup and other customers.  The plant has two production departments:  "D & I" ("drawn and iron") and "Three Piece."  D & I is the principal production department, and typically operates 24 hours a day, 365 days a year.  The D & I Department employs fifty-two production employees, four production supervisors, one assistant superintendent, and one plant manager.  The 92,000 square foot D & I facility can produce over $70,000.00 worth of product in one 12-hour shift.

---

[1] Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefs.  E.D. Cal. Local Rule 78-230(h).

From 2002 to 2006, production workers at Defendant's Sacramento plant were represented by Teamsters Local 228.  During this period, Defendant entered into two separate collective bargaining agreements with the union.  Section 4.6 of both agreements provides:  "Salaried personnel shall not perform work covered by the terms of the contract.  The Company shall restrict all salaried employees from performing manual labor normally performed by members of the bargaining unit except for the purpose of instructing or taking appropriate action in the case of emergencies."

During Plaintiff's tenure at Silgan, production employees were divided into four different crews of twelve or thirteen. Each crew worked in twelve-hour shifts.  For most of Plaintiff's term, the day shift was from 6:00 a.m. to 6:00 p.m., and the night shift was from 6:00 p.m to 6:00 a.m.  When fully staffed, each crew consisted of seven mechanics, one machinist, one electrician, two lift truck drivers, one packaging mechanic (added in 2004), and one palletizer operator.  The production supervisors, who typically worked four days on and four days off, reported to the Department Manager of D & I, who in turn reported to the plant manager.  Because the Department Manager of D & I and the plant manager worked during the day only, the production supervisor was typically the only salaried employee on the premises from early evening until the early morning.

///

///

///

///

Defendant expected production supervisors to provide front-line day-to-day management and supervision of the personnel and machinery.  They were not expected to perform production work.  A production supervisor's duties included assigning and directing the work of production workers, examining the cans inspected by production workers, and producing a variety of reports tracking production and quality statistics.

In addition to these day-to-day responsibilities, production supervisors engaged in a variety of other duties.  Production supervisors regularly evaluated temporary agency workers.  Based largely on these evaluations, Defendant would determine whether to offer these workers a "probationary" job.  Production supervisors would also evaluate probationary workers.  Defendant would consider these evaluations in determining whether to sever the employment relationship or allow probationary workers to achieve "seniority" status.  Production supervisors were also empowered to discipline employees.  Although the collective bargaining agreement set forth a formal process for progressive discipline, production supervisors could immediately suspend employees engaging in egregious misconduct.

In or around early 2003, Plaintiff began to pursue an MBA at the University of Phoenix in Sacramento, California.  He applied for tuition assistance under Defendant's Education Reimbursement Policy, receiving disbursements of $4,356.00 on August 10, 2004, $633.00 on November 23, 2004, $4,764.00 on July 12, 2005, and $2,666.00 on October 11, 2005.

///

///

Under the terms of the Education Reimbursement Policy agreement, Plaintiff agreed to repay these loans if he terminated his employment within two years of receiving tuition assistance.

In October 2005, the Department Manager of D & I, Jim Moses, replaced Dave Rex as the plant manager of Silgan's Sacramento facility.  Plaintiff thereafter understood that one of his colleagues would be selected to replace Mr. Moses as Department Manager of D & I.  Plaintiff believed he deserved additional compensation for the extra shifts Mr. Moses asked Plaintiff to work.  Mr. Moses disagreed, and Plaintiff began looking for a new job.  He resigned from his position at Silgan on May 31, 2006. In August 2006, Plaintiff applied for a production supervisor position at a Los Angeles-based can manufacturing company, Rexam. He was hired and subsequently classified as an exempt employee.

On July 12, 2006, Plaintiff filed a Complaint against Defendant in Sacramento County Superior Court.  The Complaint alleged failure to pay overtime compensation, failure to provide adequate meal and rest periods, failure to itemize wage statements, and a penalty for willful refusal to pay owed wages under California Law.  The Complaint also alleged a federal claim for failure to pay overtime compensation under the Fair Labor Standards Act ("FLSA").  Defendant removed this case to this Court and counterclaimed asserting that Plaintiff breached his contract to repay loans under Defendant's Education Reimbursement Policy.  Defendant now moves for summary judgment on all Plaintiff's claims and Defendant's counterclaim.

///

///

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense. See Fed. R. Civ. P. 56(a) ("A party claiming relief may move ... for summary judgment on all or part of the claim."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Twp. of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. at 323 (quoting Rule 56(c)).

///

6

1    If the moving party meets its initial responsibility, the

2  burden then shifts to the opposing party to establish that a

3  genuine issue as to any material fact actually does exist.

4  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

5  585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.

6  253, 288-89 (1968).

7    In attempting to establish the existence of this factual

8  dispute, the opposing party must tender evidence of specific

9  facts in the form of affidavits, and/or admissible discovery

10 material, in support of its contention that the dispute exists.

11 Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that

12 the fact in contention is material, i.e., a fact that might

13 affect the outcome of the suit under the governing law, and that

14 the dispute is genuine, i.e., the evidence is such that a

15 reasonable jury could return a verdict for the nonmoving party.

16 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52

17 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper

18 Workers, 971 F.2d 347, 355 (9th Cir. 1987).  Stated another way,

19 "before the evidence is left to the jury, there is a preliminary

20 question for the judge, not whether there is literally no

21 evidence, but whether there is any upon which a jury could

22 properly proceed to find a verdict for the party producing it,

23 upon whom the onus of proof is imposed."  Anderson, 477 U.S. at

24 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81

25 U.S. (14 Wall.) 442, 448 (1872)).  "When the moving party has

26 carried its burden under Rule 56(c), its opponent must do more

27 than simply show that there is some metaphysical doubt as to the

28 material facts....

7

Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 586-87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  <u>Anderson</u>, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

**I.   THE FAIR LABOR STANDARDS ACT CLAIM**

The FLSA requires employers to pay their employees time and one-half for work exceeding forty hours per week.  29 U.S.C. § 207(a)(1).  The FLSA provides an exemption from overtime for persons "employed in a bona fide executive, administrative, or professional capacity" and grants the Secretary of Labor the authority to set forth regulations "to define[] and delimit[]" the scope of the exemption.  29 U.S.C. § 213(a)(1).  An "employer who claims an exemption from the FLSA has the burden of showing that the exemption applies."  <u>Donovan v. Nekton, Inc.</u>, 703 F.2d 1148, 1151 (9th Cir. 1983).

///
///

Because the FLSA "is to be liberally construed to apply to the furthest reaches consistent with Congressional direction ... FLSA exemptions are to be narrowly construed against ... employers and are to be withheld except as to persons plainly and unmistakably within their terms and spirit." Klem v. County of Santa Clara, 208 F.3d 1085, 1089 (9th Cir. 2000) (internal quotation marks and citations omitted).

The applicable regulations define a "bona fide executive" as any employee (1) compensated on a salary basis at a rate of not less than $455.00 per week; (2) whose primary duty is management of the enterprise or of a customarily recognized department or subdivision thereof; (3) who customarily and regularly directs the work of two or more other employees; and (4) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.  29 C.F.R. § 541.100(a)(1)-(4).[2]

///

---

[2] Before they were amended on August 23, 2004, these regulations established both a "long test" and a "short test" to determine whether an executive employee fell within the exemption.  Defendant notes (Def.'s Mot. Summ. J. 15:20-16:7), and Plaintiff agrees (Pl.'s Opp'n to Mot. Summ. J. 7 n.1), that the current test for executive status is at least as protective of employees as the short test.  See Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees 69 Fed. Reg. 22122 (Apr. 23, 2004) (to be codified at 29 C.F.R. pt. 541) (stating that the amended test "consist[s] of the current short test requirements plus a third objective requirement taken from the long test").  Therefore, a party satisfying the current test for executive status would also necessarily satisfy the short test.  See Beauchamp v. Flex-N-Gate LLC, 357 F. Supp. 2d 1010, 1013 n.3 (E.D. Mich. 2005).  Accordingly, this Court will analyze Plaintiff's claims under the current regulations.

"The criteria provided by regulations are absolute and the employer must prove that any particular employee meets every requirement before the employee will be deprived of the protection of the Act." Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1125 (9th Cir. 2002) (quoting Mitchell v. Williams, 420 F.2d 67, 69 (8th Cir. 1969)).  Silgan must therefore prove that Plaintiff meets all of the requirements of 29 C.F.R. § 541.100(a) before he can be held exempt under the FLSA.

**A.   Compensation**

To qualify as a "bona fide executive," an employee must receive a salary of at least $455.00 per week.  29 C.F.R. § 541.100(a)(1).  Plaintiff does not dispute that Defendant paid him $55,800.00 per year (approximately $1,073.00 per week) when he began working at the Silgan Sacramento plant.  (Pl.'s Statement of Genuine Issues or Disputed Facts #16.)  Nor does Plaintiff dispute that his salary increased to $63,900.00 per year (approximately $1,229.00 per week) by August 1, 2005. Plaintiff's salary therefore satisfies the first prong of the test for an executive exemption.

**B.   Primary Duty**

To qualify as a "bona fide executive," the employee's "primary duty" must be the "management of the enterprise ... or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.100(a)(2).

The federal regulations describe "management" as inclusive of, but not limited to

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

An exempt executive's "primary duty" must be the performance of exempt work.  The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  Id.  Some factors a court may consider include "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  Id.

///

///

1    A court may also consider the amount of time an employee

2  spent performing exempt work. 29 C.F.R. § 541.700(b).  While

3  "[t]ime alone ... is not the sole test," "employees who spend

4  more than 50 percent of their time performing exempt work will

5  generally satisfy the primary duty requirement." Id.  However,

6  "[e]mployees who do not spend more than 50 percent of their time

7  performing exempt duties may nonetheless meet the primary duty

8  requirement if the other factors support such a conclusion." Id.

9    This Court notes at the outset that Plaintiff's title is

10  insufficient to establish him as a "bona fide executive." 29

11  C.F.R. § 541.2.  "The exempt or nonexempt status ... must be

12  determined on the basis of whether the employee's salary and

13  duties meet the requirements of the regulations...." Id.  That

14  Plaintiff's title as "production supervisor" is therefore

15  irrelevant to this analysis.

16    Silgan's official job description portrays the supervisor

17  position as encompassing many of the duties listed under 29

18  C.F.R. § 541.102.  According to this description, the production

19  supervisor's general responsibility is to "[e]ffectively

20  supervise assigned employees to efficiently produce a quality

21  product."  (Moses Decl. Ex. 10.)  Specific duties are divided

22  into four distinct areas:  quality, production, employee

23  relations, and resource control. Id.  "Quality" responsibilities

24  include reviewing inspection reports, personally inspecting

25  products, and receiving verbal reports. Id.

26  ///

27  ///

28  ///

"Production" responsibilities include training personnel, maintaining equipment, following standard practices, personally observing ... problem areas, reviewing production reports, and receiving verbal reports.  <u>Id</u>.  "Employee" responsibilities include directing and assigning work to the employees, administering the labor contract, administering policies and procedures, enforcing safety rules, enforcing housekeeping practices, and promoting and maintaining communications with employees, peers, staff and management.  <u>Id</u>.  Finally, "resource control" responsibilities include administering established standards, practices and procedures, reviewing employees' operating procedures, personally inspecting ... work force and material usage, reviewing reports, and receiving verbal reports.  <u>Id</u>.  Plaintiff admitted to performing all these duties at some point during his employment.  (Douglas Decl. Ex. 3, 75:4-14.)  Although this admission does not establish that these were Plaintiff's "primary duties," it does verify that Plaintiff engaged in managerial duties throughout his tenure at Silgan.

Plaintiff's own statements underscore the managerial nature of the production supervisor position.  On his résumé, Plaintiff described himself as "a member of Silgan change management."  (Douglas Decl. Ex. 5, Wilber Résumé (Ex. 70)).

///
///
///
///
///
///

13

He listed among his production supervisor duties "participat[ing] in a major long-term change management," "planning and supervising" "several semi-annual can-size change-overs," "supervis[ing] 14 factory workers daily," "participat[ing] in roughly 12 semi-annual change-over and overhaul periods of various equipment ... and packaging equipment," and "instruct[ing] and train[ing] mechanics both technically and professionally."  Id.  These satisfy several of the management criteria under 29 C.F.R. § 541.102:  "training ... employees," "planning the work," "determining the techniques to be used," and "determining the type of ... machinery, equipment or tools to be used."

Plaintiff also "apprais[ed] employees' productivity and efficiency for the purpose of recommending promotions or other changes in status."  29 C.F.R. § 541.102.  The record includes over fifty probationary employee evaluations Plaintiff completed during his tenure as production supervisor.  (Moses Decl. Exs. 14-16.)  Two questions Plaintiff was required to answer on each probationary employee evaluation were "Do you recommend this employee to become a regular seniority employee?" and "Do you recommend this employee for rehire?"

It is also well-documented that Plaintiff routinely "disciplin[ed] employees."  The record includes nine demerits Plaintiff issued during his tenure for poor attendance or tardiness.  (Moses Decl. Ex. 18.)  All bear his signature.

///

///

///

1   That the collective bargaining agreement expressly
2   prohibited production supervisors from doing production (non-
3   exempt) work, coupled with Plaintiff's awareness of this
4   prohibition, further supports a finding that his duties were
5   predominantly managerial (exempt).  Section 4.6 of the 2000-2003
6   collective bargaining agreement between Silgan/Campbell Soup and
7   Teamsters Local 228 provides that "[s]alaried personnel shall not
8   perform work covered by the terms of the contract.  The Company
9   shall restrict all salaried employees from performing manual
10  labor normally performed by members of the bargaining unit except
11  for the purpose of instructing or taking appropriate action in
12  the case of emergencies."  (Downey Decl. Ex. 1.)  The 2003
13  collective bargaining agreement, effective from February 10, 2003
14  through July 2, 2006, contains an identical clause under § 4.6.
15  (Downey Decl. Ex. 2.)  Plaintiff does not dispute that while
16  employed at Silgan Sacramento, he understood he was not to
17  perform production work.  (Pl.'s Statement of Genuine Issues or
18  Disputed Facts # 11.)

19   Plaintiff regularly participated in meetings to discuss
20  issues that included the "safety and security of the employees."
21  Production supervisors working the day shift were required to
22  attend daily "Staff Meetings."  (Pl.'s Statement of Genuine
23  Issues or Disputed Facts # 82.)  The plant manager, the plant
24  superintendent, the plant's office manager, the production
25  planner, and the plant superintendent -- all classified as exempt
26  employees -- attended these meetings.  Id.

27  ///

28  ///

15

Plaintiff does not dispute that the purpose of these meetings was "to discuss safety, quality and production issues, to formulate actions [sic] plans to respond to issues, to discuss policy and procedure and to communicate information regarding corporate initiatives and receive feedback from front line managers." Id.

"Directing the work of employees" is one exempt duty under 29 C.F.R. § 541.102. Plaintiff admitted he "tried to use ... peripheral vision" to "observe and direct or redirect actions based on policies" "probably a half of the hour, on average every hour." (Douglas Decl. Ex. 3 115:13-17.) By his own admission, Plaintiff spent approximately half his time performing exempt work.

The percentage of time Plaintiff spent producing reports, monitoring machinery, and operating machinery is not, however, dispositive to a finding that his primary duty was management. A store manager who spent ninety-five percent of his time doing non-exempt work, but who also performed important managerial duties, exercised discretion, and was relatively free from supervision was found to be an exempt executive under the FLSA. Moore v. Tractor Supply Co., 352 F. Supp. 2d 1268 (S.D. Fla. 2004). The First and Second Circuits have held that assistant managers of Burger King restaurants were bona fide executives under the short test even though they spent more than fifty percent of their time performing such non-exempt tasks as preparing and serving food. Donovan v. Burger King Corp., 672 F.2d 221 (1st Cir. 1982); Donovan v. Burger King Corp., 675 F.2d 516 (2d Cir. 1982). In those cases, the assistant managers' exempt and non-exempt duties were not readily distinguishable.

16

The First Circuit reasoned that "one can still be 'managing' if one is in charge, even while physically doing something else. The 50 percent rule seems better directed at situations where the employees' management and non-management functions are more clearly severable than they are here." 672 F.2d at 226. The Ninth Circuit found that managers of a recreational vehicle park who spent more than fifty percent of their time on plainly nonexempt manual tasks nonetheless satisfied the short test for an executive exemption. Baldwin v. Trailer Inns, Inc., 266 F.3d 1104 (9th Cir. 2001). Although Plaintiff spent at least half his time "us[ing] ... peripheral vision" to "observe and direct or redirect actions based on policies," the percentage of time spent on non-exempt duties is of greater importance under the state law claims, as discussed below. For the purposes of exemption under the FLSA, however, it is sufficient that other factors support a finding that Plaintiff's primary duty at Silgan was exempt work.

That Plaintiff does not plan to raise the issue of misclassification as an exempt employee with his new employer also supports an inference that his primary duty at Silgan was management. After leaving Silgan, Plaintiff began working as a production supervisor for Rexam – a Los Angeles-based can manufacturer -- where he is classified as an exempt employee. (Pl.'s Statement of Genuine Issues or Disputed Facts # 156.) Although Plaintiff indicated he had more "hourly tasking" and was required to do more quality checks at Silgan than at Rexam, he could not identify other material differences between the two jobs. (Pl.'s Statement of Genuine Issues or Disputed Facts # 159-160.) According to Plaintiff, the jobs are "very similar."

17

1   (Pl.'s Statement of Genuine Issues or Disputed Facts # 160.)

2   Plaintiff has not raised the issue of improper classification as

3   an exempt employee with Rexam and testified that he does not

4   intend to do so.  (Pl.'s Statement of Genuine Issues or Disputed

5   Facts # 158.)

6       Plaintiff's argument that Defendant failed to introduce any

7   evidence showing he was in charge of a recognized department or

8   subdivision is unconvincing.  As Defendant points out, courts

9   have long held that a shift may be a department or subdivision

10  for purposes of the executive exemption.  See Walling v. Gen.

11  Indus. Co., 330 U.S. 545, 549 (1947).  This Court is persuaded by

12  the fact that Plaintiff, when working the night shift, was

13  frequently the only supervisor on duty at the Sacramento plant.

14  Although he occasionally split or rotated shifts with another

15  production supervisor, and sometimes worked with different

16  twelve- or thirteen-person crews, Plaintiff was in charge of a

17  given crew for the duration of his shift.  These facts also

18  demonstrate Plaintiff's "relative freedom from direct

19  supervision."

20      During his tenure at Silgan, Plaintiff trained employees,

21  directed their work, appraised their productivity and efficiency

22  for the purpose of recommending promotions or other changes in

23  status, disciplined them, planned the work, determined the

24  techniques to be used, maintained production records, determined

25  the type machinery and equipment to be used, and provided for the

26  safety and security of the employees.

27  ///

28  ///

Accepting all Plaintiff's arguments, this Court must still conclude that his primary duty was "management of the enterprise or of a customarily recognized department or subdivision thereof."

### C.   Directing the Work of Two or More Other Employees

The third requirement for qualification as a "bona fide executive" under the FLSA is that an employee must customarily and regularly direct the work of two or more other employees. 29 C.F.R. § 541.100(a)(3). Plaintiff does not dispute that at all times during his tenure as production supervisor at Silgan Sacramento, there were twelve or thirteen production workers on any given shift in the D & I Department: seven mechanics, one machinist, one electrician, two lift truck drivers, one packaging mechanic (after 2004), and one palletizer operator. (Pl.'s Statement of Genuine Issues or Disputed Facts # 27.) Although Plaintiff claims he was "not in charge of the D & I department and was not in charge of any other fixed department at any time" (Wilber Decl. 2:17-18), this Court still finds that he customarily and regularly directed employees and that the employees he directed were subordinate. Moreover, the undisputed facts demonstrate that Plaintiff's primary duties included directing employees. (Pl.'s Statement of Genuine Issues or Disputed Facts # 63.) Defendant has therefore demonstrated that Plaintiff regularly directed the work of two or more other employees, satisfying the third prong of the test for an executive exemption.

1        **D.    Authority to Hire or Fire**

2

3        Finally, a "bona fide executive" must have the authority to

4   hire or fire other employees, or the employee's suggestions and

5   recommendations as to the hiring, firing, advancement, promotion

6   or any other change of status of other employees must be given

7   particular weight.   29 C.F.R. § 541.100(a)(4).   In making this

8   determination, a court should consider "whether it is part of the

9   employee's job duties to make such suggestions and

10  recommendations; the frequency with which such suggestions and

11  recommendations are made or requested; and the frequency with

12  which the employee's suggestions and recommendations are relied

13  upon."   29 C.F.R. § 541.105.   "An employee's suggestions and

14  recommendations may still be deemed to have 'particular weight'

15  even if a higher level manager's recommendation has more

16  importance and even if the employee does not have authority to

17  make the ultimate decision as to the employee's change in

18  status."   <u>Id</u>.

19      Although Plaintiff did not have the power to hire or fire

20  employees unilaterally, it is undisputed that Defendant relied on

21  Plaintiff's suggestions and recommendations in deciding whether

22  to hire, fire, advance, and promote employees under his

23  supervision.   Former Department Manager of D & I and current

24  plant manager James Moses afforded great (and usually

25  dispositive) weight to the evaluations and recommendations

26  productions supervisors made as to whether probationary employees

27  should continue in employment or be terminated.   (Pl.'s Statement

28  of Genuine Issues or Disputed Facts # 128.)

20

Plaintiff completed evaluations of probationary employees on at least seven different occasions. (Pl.'s Statement of Genuine Issues or Disputed Facts # 129.)  In all cases, Defendant followed Plaintiff's recommendations to hire the employees.  <u>Id</u>. On one occasion, when Plaintiff recommended that a particular probationary employee not become a regular seniority employee, that recommendation was afforded significant weight. (Pl.'s Statement of Genuine Issues or Disputed Facts # 131-132.)

Defendant has shown that no genuine issue of material fact exists as to Plaintiff's executive status as production supervisor during his tenure at Silgan.  The evidence clearly establishes Plaintiff was a "bona fide executive" under the FLSA, falling squarely within the Act's executive exemption.  Plaintiff has failed to show that any genuine issue exists.  Defendant's Motion for Summary Judgment as to the Sixth Cause of Action is therefore GRANTED.

## II.  CALIFORNIA LABOR CODE CLAIMS

California law similarly requires employers to pay their employees time and one-half for work exceeding eight hours per day or forty hours per week. Cal. Lab. Code § 510(a).  As with the FLSA, exemptions exist for persons employed in "administrative, executive, or professional capacities" in the manufacturing industry.  Cal. Code Regs. tit. 8, § 11010(1)(A). A person employed in an executive capacity means any employee:

///

///

> (a) whose duties and responsibilities involve the
> management of the enterprise or of a customarily
> recognized department or subdivision thereof; and (b)
> who customarily and regularly directs the work of two
> or more other employees; and (c) who has the authority
> to hire or fire other employees or whose suggestions
> and recommendations as to the hiring or firing and as
> to the advancement and promotion or any other change of
> status of other employees will be given particular
> weight; and (d) who customarily and regularly exercises
> discretion and independent judgment; and (e) who is
> primarily engaged in duties which meet the test of the
> exemption.... (f) Such an employee must also earn a
> monthly salary equivalent to no less than two (2) times
> the state minimum wage for full-time employment.

Cal. Code Regs. tit. 8, § 11010(1)(A)(1). Although closely

related, a few differences exist between the test for an

executive exemption under California law and the test under the

FLSA. First, an employee's suggestions and recommendations as to

the hiring or firing of other employees must be given particular

weight separate from the weight afforded to suggestions and

recommendations as to the advancement and promotion or any other

change of status of other employees. Second, an employee serving

in an executive capacity must also customarily and regularly

exercise discretion and independent judgment. Third, the

employee must be primarily engaged in exempt duties, which

include all work "directly and closely related to exempt work and

work ... properly viewed as a means for carrying out exempt

functions." Cal. Code Regs. tit. 8, § 11010(1)(A)(1)(e). The

amount of time the employee spends on exempt work, together with

the employer's realistic expectations and the realistic

requirements of the job, must also be considered. Id. Fourth,

the employee must earn a monthly salary equivalent to no less

than twice the state minimum wage for full-time employment.

///

As of January 1, 2002, this was $6.75 per hour (Douglas Decl. Ex. 6.), which corresponds to an annual wage of $14,040.00 per year. Because Plaintiff earned at least $55,800.00 per year while at the Silgan Sacramento plant (Pl.'s Statement of Genuine Issues or Disputed Facts #16) -- well over $28,080.00 (twice the annual salary of a minimum wage earner) -- this Court will address only the first three differences.

### A.   Particular Weight as to the Advancement and Promotion of Other Employees

Silgan afforded particular weight not only to Plaintiff's suggestions and recommendations as to the hiring or firing of other employees, but also to Plaintiff's suggestions and recommendations as to the advancement, promotion, and change of status of other employees.  As discussed, supra, Plaintiff does not dispute that former Department Manager of D & I and current plant manager James Moses afforded great (and usually dispositive) weight to Plaintiff's evaluations and recommendations as to whether probationary employees should continue in employment or be terminated.  (Pl.'s Statement of Genuine Issues or Disputed Facts # 128.)  Separate from the evaluation of probationary employees, Plaintiff, on at least nine separate occasions, completed performance evaluations which would ultimately determine whether an employee was entitled to a pay increase.  (Pl.'s Statement of Genuine Issues or Disputed Facts # 136.)  Production supervisors also made recommendations as to whether individuals hired for skilled positions should advance from "trainee" to "non-trainee" status.

Management afforded these recommendations significant weight.
(Pl.'s Statement of Genuine Issues or Disputed Facts # 140.)
Thus, in addition to the particular weight afforded Plaintiff's
suggestions and recommendations as to the hiring or firing of
Silgan employees, Defendant separately afforded particular weight
to his suggestions and recommendations as to the employees'
advancement, promotion, and change of status.

### B.   Discretion and Independent Judgment

Contrary to his assertion that he was merely an "automaton
whose every action was ... controlled and monitored" (Pl.'s Opp'n
to Mot. Summ. J. 1:5-6), Plaintiff's own admissions demonstrate
he customarily and regularly exercised discretion and independent
judgment.  Plaintiff was generally the highest ranking supervisor
working from approximately 5:30 p.m. to 7:00 a.m. (Douglas Decl.
Ex. 4, 193:6-10.)  Plaintiff had to exercise discretion and
independent judgment every time a new situation arose, which
occurred regularly.  (Douglas Decl. Ex. 4, 220:24-221:1)
("[t]here's always going to be something new that comes up, and
frequently it resulted in us getting berated in the morning.")
When a new situation affecting "just an hour's production"
presented itself, Plaintiff did not call Mr. Moses.  (Douglas
Decl. Ex. 4, 223:1-12.)  Whenever a production crew was
understaffed, Plaintiff had to decide whether to call in a D & I
employee not scheduled to work, whether to call in a D & I
employee from another work classification, or whether to call a
"Three Piece" employee to cover that particular shift.

(Douglas Decl. Ex. 4, 245:12-24; 258:8-11.)   Plaintiff
prioritized which equipment needed maintenance.   (Douglas Decl.
Ex. 4, 248:7-14.)   He ascertained whether production workers
responded appropriately to problems.   (Douglas Decl. Ex. 4
317:12-15.)   Plaintiff would coach, train, discipline, and
instruct; and observe, address, and delegate housekeeping on a
daily basis.   (Douglas Decl. Ex. 4 355:13-21; 362:13-15.)   These
admissions firmly establish the extent to which Plaintiff
customarily and regularly exercised discretion and independent
judgment.

### C.   Primarily Engaged in Exempt Duties

To qualify as an executive in the manufacturing industry in
California, an employee must primarily engage in exempt duties,
which include all work "directly and closely related to exempt
work and work ... properly viewed as a means for carrying out
exempt functions."   Cal. Code Regs. tit. 8, § 11010(1)(A)(1)(e).
Activities constituting exempt and non-exempt work under
California law "shall be construed in the same manner" as those
under the FLSA "effective as of the date of this order" --
January 1, 2001.   Id.   Exempt work need not consist exclusively
of duties listed as exempt under the FLSA, but also work
"directly and closely related to exempt work."   Id.   Thus, while
the California test is stricter than the FLSA's "primary duty"
test (i.e., in California, more than half the work must be
exempt), the duties themselves need not be absolutely exempt, but
merely "directly and closely related to exempt work."

1    Unlike the "primary duty" test, in which a court must

2  consider current FLSA regulations, California law requires courts

3  to consider activities as described in the FLSA as of January 1,

4  2001.  Cal. Code Regs. tit. 8, § 11010(1)(A)(1)(e).  Under 29

5  C.F.R. § 541.108(e) (2001), "a supervisor who spot checks and

6  examines the work of his subordinates to determine whether they

7  are performing their duties properly, and whether the product is

8  satisfactory, is performing work which is directly and closely

9  related to his managerial and supervisory functions."

10    Plaintiff admits "the routine inspection of cans" occupied a

11  "significant portion" of his time -- somewhere between 33% and

12  50% of any given shift.  (Pl.'s Opp'n to Mot. Summ. J. 3:24-4:3.)

13  Although Plaintiff disagrees with Defendant's characterization of

14  this task as "spot checking," his argument is unconvincing.  It

15  was Plaintiff who used this very term in his April 7, 2007

16  deposition to describe his inspection of cans.  (Douglas Decl.

17  Ex. 3 94:18-95:8.)  Thus, by Plaintiff's own admission, he spent

18  between 33% and 50% of his time performing work directly and

19  closely related to his managerial and supervisory functions.

20    "A supervisor who watches the operation of the machinery in

21  his department in the sense that he 'keeps an eye out for

22  trouble' is performing work which is directly and closely related

23  to his managerial responsibilities."  29 C.F.R. § 541.108(f)

24  (2001).

25  ///

26  ///

27  ///

28  ///

Plaintiff admitted he "tried to use ... peripheral vision" to "observe and direct or redirect actions based on policies" "probably a half of the hour, on average every hour" (Douglas Decl. Ex. 3 115:13-17), and that when he performed quality checks he was "consistently watching [his] surroundings and observing" (Douglas Decl. Ex. 4 331:9-18).  Again, by his own admission, Plaintiff spent approximately half his time performing work directly and closely related to his managerial responsibilities.

"Maintaining control of the flow of materials," is an exempt function.  29 C.F.R. § 541.108(c) (2001).  Plaintiff would check the line speed and line control functions "constantly throughout the course of the shift."  (Douglas Decl. Ex. 4 324:15-19.) Thus, during any given shift, Plaintiff was "constantly" performing an exempt function.

Defendant has demonstrated that no genuine issue of material fact exists as to any prong of the test for executive exemption in the manufacturing industry under California law.  Plaintiff has failed to show that any genuine issue exists.  As an exempt executive, Plaintiff was not entitled to overtime compensation. Since Defendant did not fail to pay unpaid wages, it is therefore not liable for waiting time penalties.  The requirement for employers to provide adequate meal and rest periods, and to itemize wage statements "shall not apply to persons employed in ... executive ... capacities."  Cal. Code Regs. tit. 8, § 11010(1)(A).  Accordingly, Defendant's Motion for Summary Judgment as to the First, Second, Third, Fourth, Fifth, and Sixth Causes of Action is GRANTED.

///

27

**III.  DEFENDANT'S COUNTERCLAIM FOR BREACH OF CONTRACT**

    To prove breach of contract under California law, a party must demonstrate the existence of a contract, plaintiff's performance of the contract or excuse for nonperformance, defendant's breach, and the resulting damage to plaintiff.  <u>See</u>, <u>e.g.</u>, <u>McDonald v. John P. Scripps Newspaper</u>, 210 Cal. App. 3d 100, 104 (Cal. Ct. App. 1989).

    Plaintiff began to pursue an MBA at the University of Phoenix in Sacramento in or around early 2003.  He obtained this degree in 2005.  (Pl.'s Statement of Genuine Issues or Disputed Facts # 194.)  Plaintiff and Defendant entered into a Graduate Program Educational Reimbursement Agreement on April 28, 2004. (Downey Decl. Ex. 5; Pl.'s Statement of Genuine Issues or Disputed Facts # 196-198.)  By signing the agreement, Plaintiff "unconditionally and irrevocably agree[d] to repay Silgan Containers Corporation & Subsidiary's [sic], if [he] terminate[d] [his] employment within two (2) years of receiving such reimbursement, for the amount of such reimbursement."  (Downey Decl. Ex. 5.)  Defendant paid Plaintiff $4,356.00 on August 10, 2004; $644.00 on November 23, 2004; $4,764.00 on July 12, 2005; and $266.00 on October 11, 2005.  All disbursements were for educational expenses.  (Downey Decl. Ex. 7; Pl.'s Statement of Genuine Issues or Disputed Facts # 201-205.)  Plaintiff resigned from his position as production supervisor at Silgan Containers Corporation effective May 31, 2006.  (Pl.'s Statement of Genuine Issues or Disputed Facts # 205.)
///

At the time of Plaintiff's resignation, he had incurred educational expenses totaling $10,300.00.  (Pl.'s Statement of Genuine Issues or Disputed Facts # 206.)  To date, Defendant has not received repayment from Plaintiff for these educational expenses.  (Pl.'s Statement of Genuine Issues or Disputed Facts # 206.)

Plaintiff "does not oppose the Cross-Complaint motion." (Pl.'s Opp'n to Mot. Summ. J. 14:11-12.)  Because there is no genuine issue as to any material fact relating to Defendant's counterclaim against Plaintiff for breach of contract, Defendant's Motion for Summary Judgment as to this claim is GRANTED.

**CONCLUSION**

The pleadings, depositions, answers to interrogatories, and admissions reveal no genuine issues as to any material fact surrounding Dana Wilber's employment status during his tenure at Silgan.  He was a salaried employee whose primary duties involved the management of the Sacramento plant.  He customarily and regularly directed the work of approximately thirteen employees. His suggestions and recommendations as to the hiring and firing of production workers, and as to their advancement and promotion, were given particular weight.  He customarily and regularly exercised discretion and independent judgment, and he was primarily engaged in exempt work or work directly and closely related to exempt work.
///

1  For these reasons, he "plainly and unmistakably" falls within the

2  terms and spirit of the executive exemption for overtime

3  compensation under the FLSA and California law.   Defendant's

4  Motion for Summary Judgment as to the First, Second, Third,

5  Fourth, Fifth, and Sixth Causes of Action is therefore GRANTED.

6      Under the Graduate Program Educational Reimbursement

7  Agreement, Defendant paid Plaintiff $10,300.00 in educational

8  loans so that Plaintiff could obtain his MBA.   The Agreement

9  required Plaintiff to repay these loans if he terminated his

10  employment within two years of the disbursements.   Plaintiff

11  resigned less than two years after receiving these disbursements,

12  but never repaid Defendant.   Plaintiff does not oppose

13  Defendant's counterclaim.   For these reasons, Defendant's Motion

14  for Summary Judgment as to its crossclaim for breach of contract

15  is GRANTED.

16      IT IS SO ORDERED.

17   Dated: August 18, 2008

18

19

20  _____
    MORRISON C. ENGLAND, JR.

21  UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

30